Statement of the Case.
NICHOLLS, J.
Plaintiffs originally asked for judgment against the defendant for $3,000, but subsequently reduced their prayer to $1,990.40, with interest.
They averred that their father, August Feiber, died on the 24th of November, 1901, and that they were his sole heirs; that on the 10th of July, 1897, he insured his life in the defendant’s order for the benefit of his wife, Sanche Feiber, evidenced by certificate No. 190,976, whereupon he became a member of Bienville Council, No. 869, located at New Orleans; that he was subsequently transferred to Chalmette Council, No. 801; that the deceased died a member in good standing of said order and council; and that he had paid all assessments duly called for, and had complied with all the terms attached to said policy or benefit certificate.
That immediately after the death of their father they had notified Chalmette Council and defendant of the same, but they refused to appoint the committee to ascertain the cause of his death, and the circumstances attending the same, and the defendant refused to pay and settle with them on account of insufficient reasons, which were at variance with the terms and conditions contained in the policy or benefit certificate, with the law existing at the time of the contract and the issuance of said certificate, and also at variance with the terms and conditions of the by-laws as they existed at the death of the insured. In view of the premises, they prayed for judgment.
Defendant answered. After pleading the general issue, it averred that the said contract or benefit certificate was made and delivered to August Feiber upon his express agreement that he would abide by and be governed by all the by-laws then existing or that might thereafter be enacted by it (the Supreme Council American Legion of Honor). It averred that afterwards, on August 21 and 22, 1900, at a session held by it at Atlantic City, its by-laws were lawfully amended and changed, and made to read, and did thenceforward read, that $2,000 should be the maximum amount that it would pay after September 30, 1900, on the death of any member holding a certificate for $2,000 or over; that August Feiber ratified and confirmed said amendment to the bylaws, because thereafter he permitted all assessments against him to be made, collected, paid, and received by it on the sole basis that his beneficiaries should never be entitled to demand or to receive from it in satisfaction of said benefit certificate any sum of money exceeding $2,000.
It further averred that the contract or benefit certificate was made and delivered to August Feiber upon the express condition that it should be void if he should neglect to pay all assessments called to the benefit fund within the time and manner required *963 by its by-laws, and it averred that by its by-laws it declared that on or before 11 o’clock p. m. of the last day of each calendar month each member of the order should pay to the collector of his council, without notice, one assessment in accordance with the table of rates in by-law No. 54, and that in default thereof the member should stand suspended from membership in said order and all benefits therein, and his benefit certificate should be void. It averred that afterwards, to wit, October 31, 1901, August Feiber neglected and refused to pay a certain assessment upon him, which called for a large sum of money, to wit, $9.50; that the payment of said sum of money on the day and year last mentioned was necessary to preserve him as a member in good standing in the said order, and, in consequence of said neglect and said refusal to pay said assessment on the day and year last mentioned, said Feiber ceased to be a member in good standing in said order, and all rights and claims whatsoever, if any he had, ceased and determined, and said benefit certificate became and was absolutely null and of no force or effect whatsoever.
It further averred that the contractor benefit certificate was made and delivered to said Feiber on the express conditions that it would not be bound to pay any sum of money whatsoever upon the same to his beneficiaries unless he was a member in good standing at the time of his decease, and it averred that he was not in good standing at the time of his decease, because he neglected and refused to pay the' last installment due and payable immediately preceding his alleged death.
The district court rendered judgment in favor of the defendant, and plaintiffs appealed to the Court of Appeal. That court, on the original hearing of the case, affirmed the judgment appealed from, but, on rehearing, reversed it. This application for review followed, and the judgment of the Court of Appeal is before us for review.
In the second judgment rendered by the Court of Appeal it said: “Our opinion on the original hearing of the cause was to the effect that, upon any member of the association failing to pay any assessment within the period prescribed by article 56 of the by-laws, he was ipso facto suspended; no personal notice to him being required, and no action by his council being necessary to accomplish the suspension. That is still our opinion. But we entirely overlooked the concluding paragraph of that by-law, which provides that ‘notice of all assessments shall be given to every council in such manner as the executive committee shall direct.’
“Thus it appears that whilst the individual members are not required to have personal or actual notice of assessments served on them, as a prerequisite to the self-operating effect of by-law No. 56 being visited on them in the event of their defaulting in the payment of an assessment, none the less the council with which the member is affiliated must have notice of all assessments, and that notice must be given, and can be binding and effective only when given, ‘in such manner as the executive committee may direct.’ Hence we must ascertain, first, what mode and manner of giving notice of all assessments has the executive committee adopted? and second, has proper notice of the assessment, for the nonpayment of which it is claimed the member, August Feiber, has been suspended, and his benefit certificate forfeited, been given to the council of which he' was a member?
“It is clear to our mind, now that our attention has been specially directed to the paragraph quoted, that it was not the design and scheme of the defendant association to-dispense with all notices whatsoever prior to the enforcement of the penalty of suspension.
“Whilst specifically providing that ‘every member shall pay to the collector of his council and without notice one assessment,’ etc., *965 and stipulating that, if it be not paid within the period -stipulated, the member ‘shall stand suspended from membership in the order and all benefits therein and his benefit certificate shall be void,’ nevertheless it is patent that it was intended that the member should have constructive notice of the assessment, by a general notice to the subordinate councils of the order, to be given in such manner as the executive committee of the supreme council may determine.
“No other construction of the paragraph quoted can be suggested.
“ ‘Notice of all assessments shall be given to every council,’ etc., is the peremptory injunction of the by-law; and, in view of the fact that it is found in the very article of the by-law which declares that the member shall pay ‘without notice,’ it can scarcely be doubted that the obvious meaning of the entire article is that the members should not be given individual notices of an assessment; that no actual notice was required, but that a notice would be given to the council of which they were members; and that that notice to the council should serve as a constructive notice to the individual members.
“If the members failed to attend their council meetings which the seventy-fifth bylaw provides shall be held weekly or semimonthly, and thereby are not advised that an assessment, in the language of the by-laws and the benefit certificate, is ‘called,’ they must take the consequences.
“The only notice they are entitled to is the constructive notice which they have through the actual notice given their council. But this constructive notice they are certainly entitled to, and, if not given, the members are not delinquent. They do not stand suspended, and their benefit certificate is not void. The inquiry, therefore, is, was notice of the assessment which it is claimed August Feiber, the deceased member, did not pay, and for the nonpayment of which it is insisted all rights under the benefit certificate were lost to the beneficiary therein named, given to the council of which he was a member, and was the notice given, if any was given, in such manner as the executive committee directed? Inasmuch as all that, the plaintiffs have to do in order to recover is to show the death of the member, and their heirship to the beneficiary named in the benefit certificate, and to offer the benefit certificate in evidence, the onus is therefore on the defendant association to clearly establish the existence of every state of facts and conditions necessary, under the terms of the law of the association and the benefit certificate, to work a forfeiture.
“Nothing may be taken for granted. It must clearly appear, and the defendant must affirmatively show, that every formality of the order which is requisite to the suspension of a member and the forfeiture of rights under the contract has been complied with. Has it done so? We find in the record a printed document reading as follows:
“ ‘Boston, Mass., Oct. 1, 1901. To the Officers and Members of Subordinate Councils — Oompanions: You are hereby notified that assessment No. 57 is called October 1st and due Oct. 31st, 1901. Members suspended on this assessment must be re-examined to be reinstated. This notice will come to some suspended Councils. To such Councils and members thereof this notice shall not be deemed a waiver by the Supreme Council, or as recognizing suspended Councils until formally reinstated. [Signed] W. N. Davenport, P. F. McGowan, Adam Wormack, J. W. Kendrick, Jr., J. Foster Bush, Executive Committee. [Seal.J
“The signatures to this document are also printed.
“It does not appear that this document is really a document received by any subordinate council of the order notifying it of a call for assessment No. 57, the assessment which it is claimed the deceased member, August Feiber, did not pay. But assuming, for the *967 purpose of discussion, that it is one of the notices sent out to subordinate councils, there is not a word of evidence in the record showing that any such notice was ever given to the council of which Feiber was a member, and none establishing the manner adopted by the executive committee for giving notice of assessments.
“It is not only necessary for the defendant association to show that a notice of the assessment was given to the council with which Feiber was affiliated, but that the notice was given in the manner provided for and directed by the executive committee. Neither has been established. Forfeitures are not favored by the law; hence it was incumbent upon the defendant to establish the default by competent proof before it will be permitted to insist on a forfeiture of membership. As we hold that notice to the subordinate council .was a prerequisite to suspension, and as proof of such, notice is lacking, it follows that the deceased, August Feiber, was not a suspended member of the order at his death, and that consequently the plaintiffs are entitled to recover under the certificate.”
Opinion.
By the benefit certificate or policy upon which the plaintiffs declare, the supreme council of the American Legion of Honor, in consideration of the full compliance of August Feiber with all its by-laws then existing or thereafter adopted, and the conditions contained in the certificate or policy, agreed to pay his wife, Sanche Feiber, $3,000 upon satisfactory proof of his death while in good standing upon the books of the supreme council, and a full receipt and surrender of the certificate, subject, however, to the conditions, restrictions, and limitations following:
“First. * * *
“Second. That said companion shall have paid all assessments called within the time and in the manner required by the by-laws of the supreme council in force at the time of the issuance of this certificate or as -the same may be hereafter amended.
“Third. * * *
“Fourth. * * *”
The fifty-fourth by-law of the order declares that “each member of the order shall pay to the collector all assessments called according to age and the amounts of benefit certificate as specified in the following table of rates which shall be the rate of assessments for, all members of the order: [Here follows table of rates referred to.]”
The fifty-sixth by-law declares that “on or before eleven o’clock p. m. of the last day of each calendar month every member of the order shall pay to the collector of his council and without notice one assessment in accordance with the table of rates in by-law No. 54. if necessity require, the executive committee may at any time call an extra assessment of the whole or any part of the table of rates which shall be payable on or before eleven o’clock p. m. of the fifteenth day of the month succeeding the date of the call. In default thereof a member shall stand suspended from membership in the order and all benefits therein and his benefit certificate shall be void. * * * Notice of all assessments shall be given to every council in such manner as the executive committee shall direct.”
The 130th, 134th, and 135th by-laws are as follows:
“Art. 130. Every member shall be entitled to a fair trial for any offence involving reprimand, suspension (except for nonpayment of dues or assessments), or expulsion, and no member shall be put on trial unless charges duly specifying the offense so as fully to apprise the member to prepare for his defense, shall be submitted to the council, in writing, feigned by a member of the order.”
“Art. 134. When a member shall be subject to a penalty of fine or reprimand and fail to pay the fine or refuse to attend at any regular meeting fixed by the commander, to be *969 reprimanded, he shall be suspended from all benefits and privileges of the council until he pay the fine or so attend.
“Art. 135. At the expiration of thirty days from the date of any suspension or expulsion, unless a notice of appeal from the action has been filed with the secretary of the council, the secretary shall notify the supreme and grand secretary of such suspension or expulsion.”
Counsel of the defendant urge in their brief that “the error committed by the Court of Appeal was in construing the last provision of by-law 56 as applying to both regular and extra assessments, while in fact it applies only to extra assessments. The executive committee was empowered to call extra assessments, and directed to give notice of all assessments, but that means all assessments which require notice, namely, extra assessments, because the regular monthly assessments require no notice. The amount of the regular assessment is fixed by by-law 54, and the day of payment by by-law 56, and that by-law specially directs that it shall be paid without notice. We submit no notice of the regular assessment is required, because by-laws 54 and 56 constitute a continuing notice to all members of the amounts and duties of payment of their regular monthly assessments. But as the executive committee is empowered by by-law 56 to call extra assessments whenever necessity requires, the by-law is made to provide for a notice of the extra assessments which from time to time may be called, and it is only proper that some notice should be given when an unusual thing is to be done.”
Referring to the 135th by-law, which counsel of the plaintiffs cite in support of the position which they urge — that Eeiber was not suspended until his own council had notified the supreme council of the fact of his default in paying his regular assessment, and it had noted the fact of his suspension on its own books — counsel say: “If the court will read this by-law and the four preceding bylaws, it will be seen that all those by-laws refer to the trial of members for various offenses — none for the nonpayment of assessments and dues. By-law 135 says that every member shall be entitled to a fair trial for any offense involving reprimand or suspension except nonpayment of assessment and dues.
“It will therefore be seen that for nonpayment of assessments and dues members are not entitled to a trial, and the secretary of Feiber’s council could not be required to notify the supreme secretary of Feiber’s suspension for nonpayment of the assessment that he failed to pay; and the more so because by-law 56 says that for neglect to pay an as- ■ sessment within the time specified by the by-law the member shall stand suspended, and shall forfeit all his rights under his benefit certificate. But even if it were the duty of the secretary of Ohalmette Oouncil to notify the supreme council of Feiber’s suspension, his neglect to do so would not help the plaintiffs’ case, because it is not his act in informing the supreme council of Feiber’s failure to pay the assessment which brings about his suspension, but his own act — his* neglect to pay the assessment. A very well reasoned case on that point is Rood v. Railway Passenger & Freight Conductors’ Benefit Mutual Association (C. C.) 31 Fed. 62.”
We agree with counsel of defendant that the notice of suspension or expulsion which is required by the 135th by-law to be given to the supreme grand secretary is suspension or expulsion resulting from some other cause than nonpayment of regular dues — a suspension or expulsion following some offense or violation of rules, and imposed as a punishment for the same after a trial from the judgment in which an appeal would lie. We have not been advised of anything in the bylaws of either the local council or the supreme council making an “order of suspension” for nonpayment of regular monthly as *971 sessments necessary to be made in order to bring about that result, nor giving to tbe suspended member a right of appeal. We do not think that the 135th by-law has any bearing upon the issues involved in this case. We suppose it was quoted in support of the position taken by the plaintiffs — that, until the fact of suspension was entered in the books of the supreme council, there was no suspension. Even were we to accept the position itself as correct, it would not be affected by that by-law, for it says nothing of any entry having to be made upon the books as a result of the notification. If the position taken be correct, it will have to be sustained from some source other than that bylaw. We take it for granted, as a matter of fact, that notice has to be given at some time by the secretary of the local council of the fact of suspension of individual members for nonpayment of the regular monthly assessments, for the information of the supreme council, but we fail to find anywhere authority" for the contention that “suspension” for that cause should be “itself suspended” until entry upon the books of the supreme council.
The wording of the benefit certificate itself is pointed to'as justifying the position. It is said the policy declares that the defendant agreed to pay Sanche Eeiber, wife, $3,000, upon satisfactory proof- of August Eeiber’s death while in good standing upon the books of the supreme council; that this can have no other meaning than that, so long as he stood on the supreme council’s books as in good standing, there was, for the purpose of the payment of the certificate, no suspension at all. The policy does contain the language referred to, but its generality is qualified by the subsequent words, “subject, however, to the conditions, limitations, and restrictions following,” and among these conditions, restrictions, and limitations is the one which declares that “said companion shall have paid all assessments called within the time and in the manner required by the by-laws of the supreme council in force at the time of the issuance of the certificate, or as the same may be amended.”
We agree with counsel of the defendant that there are two classes of assessments of members of councils provided for in the fifty-sixth by-law — one according to the table of rates thereunder as fixed and levied therein by the supreme council itself of the order, and the other extra assessments levied and called by the executive committee of the order, should necessity exist for such extra assessments. We may accept as true that all assessments — even the regular monthly assessments referred to in by-law 56 — should, as between the local council and the supreme council, be called for by the latter, without in the slightest manner touching the question as to whether, as between the supreme council and the individual members of the different councils, the latter should be required to pay the regular monthly assessments punctually as they fall due, according to the requirement of by-law 56, without inquiry as to what the situation might be between the local council and the general council.
The obligation of the individual members to pay was not, so far as they were concerned, made dependent upon whether the council to which they belonged should have been notified of a particular call for assessment. That was a matter in which they individually had no concern. That was a matter between the two councils. Their duty was to pay according to the fifty-sixth by-law, without notice, for notice as to how much they had to pay, and when they had to pay, had been communicated to them by the by-law itself. If the necessity for an extra assessment should arise, it would be imperative that individual members should be duly notified in the premises, for they could not be suspended, or their benefit rights cut off, unless they should be in default, and they *973 could not be in default unless and until they bad been advised of the situation, and called upon to perform the obligations arising from it. They occupied towards payment of the regular monthly assessment an entirely different position. By the precise terms of their own contract with the organization to which they belonged, default, (by their own consent) followed nonpayment of the same at the time and in the manner provided for.
There is a difference between the dues owed by the individual members of each council to the local council itself, and the amounts which the individual members bound themselves to contribute to the support and the carrying out of the general objects of the order.
We are not dealing in this case with the relations between Feiber and Chalmette Council. That matter is not before us.
The view we take of the relations between Feiber and the order itself is sustained by the terms of the provisions of by-law No. 64, which declares the steps to be taken by local, councils in the event of a death of one of their members. It is therein provided that the council, on a death of a member, should appoint a committee of three to ascertain the cause of death, and the circumstances attending the same, but the member so dying is referred to as a member who at the time of his death should not be under suspension for nonpayment of an assessment; and again, in referring to the payment of benefit certificates, by-law No. 55 declares, “Provided that the member be a member of the order in good standing, and shall have complied with all the laws, rules and regulations of the order as they now are or they may hereafter from time to time be altered or amended.”
The proposition advanced by appellants, that the benefit certificate issued by the Supreme Council of the American Legion of Honor was not a reciprocal contract between the parties, because it was not signed by Feiber, is without any force. Insurance policies are never signed by the insured party. His acceptance of the contract evidenced thereby under its terms and conditions is shown by his payment of the premiums, and the suit itself by the beneficiaries upon the contract.
Plaintiffs urge upon us the hardship of this particular case. They point to the fact that Feiber had been a member of the order for 18 years, and during that whole time had paid out promptly assessments amounting to over $2,000, and that it would be harsh and inequitable to deprive his children of the benefit of his outlays for a mere slip in the payment of one solitary assessment.' They say his sudden death deprived him of the power to reinstate himself in the order by making payment later, for he died 24 days after his default. It is unquestionably very unfortunate for Feiber’s children that this default should have taken place under the precise circumstances it did, but courts cannot travel outside of the limits of the special law which parties create between themselves by contract, in order to afford relief to children, no matter how strong their sympathy may be enlisted in their behalf. The rights of other parties are concerned in this matter. We are not dealing with our individual concerns over which we have free action.
The 110th by-law expressly declares that no reinstatement of a member under suspension shall occur in any case where the payment of the arrears for dues, fines, and assessments necessary to reinstatement is made on the day of, or at any time after, the death of any such member.
In Maginnis v. Aid Association, 43 La. Ann. 1139, 10 South. 180, the executor of the insured’s succession offered, 10 days after the death of the certificate holder, to pay the amount on which he defaulted, but this court said it was then no longer possible to com *975 ply with the regulation of the association. It was an agreement in due form, binding on all the members, that in case of death during suspension the right to recover on a certificate was lost; that it was only enforcing a condition the members had made a law unto themselves; that the suspension was complete before death, and nothing in the nature of a waiver to avoid the effect of the suspension had been shown. The court said, when a charter contains an article suspending a member for the nonpayment of an assessment, it is conclusive and binding. In that case, differently from the ease before us, the regulation of the company required notice, as a condition precedent to suspension, and such notice had been given. Referring to the regulation, the court said: “It was self-operative, and took effect after notice; that is to say, it required no order of suspension to carry it info effect.”
Counsel for the defendant, answering the argument of hardship involved in this case, say that it was more apparent than real; that the contract was aleatory in character; that for 18 years the order carried the risk of paying the amount of the policy to the beneficiaries named; and that, in view of that risk it carried for that time, it was entitled to get the benefit of the terms and conditions on which the risk was assumed. They say that the amount actually paid by Eeiber was no larger per year than what he would have paid in the way of premiums in any ordinary life insurance company. They further say that Feiber’s default upon the particular assessment was not the result of want of knowledge of the same, or from oversight, inadvertence, or carelessness; that he intentionally declined to pay, having become unwilling to make any further assessments; and that he wished to drop out of the order.
The following questions were asked of, and answered by, the secretary of Chalmette Council, to which Feiber belonged:
“Q. Did he [Feiber] pay assessment No. 57, or did he refuse to pay it? A. He refused to pay No. 57.
“Q. When was that due and payable? A. That was due and payable on the 31st of October, 1901.
“Q. You say he refused. What words did he use to you?”
Objection was here made to any parol evidence going to show any change in the benefit certificate. Any resignation or suspension of any kind must be in writing. If he did refuse, that it' was not competent evidence in this case. That no parol evidence was admissible against the policy as to what may have been said by the insured, since no verbal resignation was allowed, under section 119 of the by-laws. That what Eeiber said to Mr. Crawford, the secretary, was illegal, because it was hearsay evidence — the evidence of a dead man, not stated as against his interest, but against the interest of his wife. The policy belonged to her, as her separate and paraphernal property. The court overruled the objections.
“Q. Will you tell the court what words Mr. Eeiber used to you on that subject? A. He ‘concluded to drop it,’ were the words he used.
“Q. ‘To drop it’? A. ‘To drop it.’ After Mr. Eeiber came into Chalmette Council, I met him going backwards and forward in the cars, and we had conversations in reference to the enormous number of assessments that were being charged against him’; and, of course, every time we. met we had the same kind of conversation, and this last conversation was in my office. He came to see me personally and wanted me to give him my opinion, and I told him I could not; that the order was in good shape, and the only thing he had to do when he felt he did not want to pay was to refuse, and in this case he did refuse.
“Q. You mean on the last assessment you are speaking of? A. Yes, sir; and I saw him *977 on the loth of October, when assessment No. 56 became due, and previous to that, and he said he would not pay No. 56, but he sent Messrs. H. & B. Beers’ check for the amount on the 15th of October, and, of course, that waived the question of his wanting to drop; but between that time and the 31st of October I did not have any conversation with reference to the payment of assessment No. 57, but shortly after the 31st of October I met him on Yariete alley. I was there on some business, and he stopped me and says: ‘Brother Crawford, couldn’t you arrange to get me some of that money back that I have paid to the supreme council?’ I said: ‘Why, Mr. Feiber, that money has been distributed to the different beneficiaries. We keep none on hand. It is all for them.’ He says: ‘I have paid a good deal of money into the order, and I would like to get some of it back.’ I told him: ‘The only way for you to do would be to make a request for yourself.’ He said he would do that; that he had paid a great deal of money into the order. When a man don’t pay his assessments, why, he is dropped.
“Q. Did you ever report that assessment as unpaid to the order? A. Yes, sir.” Witness, referring to his assessment book, says: “Assessment No. 56 he paid.”
“Q. Was he reported to the supreme council? A. He was reported to the supreme council on December 6th as having failed to pay assessment No. 57.
“Cross-Examination.
“Q. Mr. Feiber told you that he did not wish to keep on in the order. When was it he told you? A. Finally—
“Q. The first time he told you? A. Well, the 6th of November. I was going at the time to make that remittance of 1901.
“Q. Did he tell you? A. Yes, sir.
“Q. Where did you meet him? A. I got it over the phone.
“Q. You got it over the phone? A. Yes. Pie had told me previously to that that he would not pay No. 57, but, to finally fix that he had not changed his mind, I got it over the phone.
“Q. I thought you said the last conversation you had was for No. 56 — that he did not want to pay No. 56? A. I said he told me that, but he paid it.
“Q. But before assessment No. 56 became due he told you he did not want to go on in the order any more? A. Yes, sir.
“Q. But subsequently to telling you that he paid No. 56? A. Yes.
“Q. After that, did you have any conversation with him in reference to assessment No. 57? A. Yes, sir; I had. Coming down in the car between the 15th and the 31st of October, he told me he would not pay No. 57. I could not fix the exact date, but it was between those dates. I know it was between those dates, because I had conversations with him. He had already paid No. 56, and No. 57 did not become due until the 31st of October. I told him that assessment No. 57 would fall due on the 31st of October, and he said he would not pay it.
“Q. He had told you the same thing about No. 56? A. Yes.
“Q. And he paid you No. 56? A. Yes; he paid it.
“Q. Then, if he told you that, when did he meet you in Variete alley? A. I met him about the 10th of November.
“Q. What did he tell you — that he wanted to get back some of his money? A. He said he wanted to get some of his money back.
“Q. You say you telephoned him on or about the 6th of November? A. Yes; at H. & B. Beers. He answered me. He told me he wanted to drop it. I could not be mistaken in his voice. I am sure it was he. I knew it. I know it was the 6th of November, because on that day it was necessary -for me to send off the remittances to the supreme council. I ■ am positive Feiber told me he *979 wanted to drop from' the order. He told me ■on the 10th of November that he wanted to get some of his money back. Ohalmette Council took no action to suspend him. I told him he had been suspended, and, in order to get back, he would have to pay to be reinstated.”
If Eeiber, under his contract with the defendant, had been entitled to have had notice of the assessment given to him, and at a particular time and manner, it may be true that, unless notified at the time and in the form and manner contracted for, he would not have lost his rights by not paying his assessment promptly, but we are of the opinion that he was not entitled to have had such notice. We have copied the testimony adduced to relieve the ease of its apparent harshness.
The plaintiffs strenuously contend that the Individual members of the Clialmette Council had the right to demand that notice of assessment No. 57 should have been given to it. Conceding that claim to be correct, we think notice was given to the council. The Court of Appeal states that the paper purporting to be such notice was not proved up, nor was it shown to have been received by the council, but it appears to have been produced by it under a subpoena demanded by the plaintiffs. It was not only offered in evidence by the defendant, as shown by the note of evidence, but plaintiffs’ counsel (so the note of evidence declares) offered the notice to the council of assessment No. 5G for the purpose, he said, of showing the difference between the two calls of Nos. 56 and 57.
We are of the opinion that the judgment of the district court rejecting plaintiffs’ demand and dismissing their suit, which judgment was affirmed by the Court of Appeal, was correct, and that the judgment of the latter court on the rehearing is erroneous. For the reasons assigned, it is hereby ordered, adjudged, and decreed that the judgment of the Court of Appeal herein brought up for review is hereby annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that the judgment of the district court herein be, and the same is, affirmed. Plaintiffs’ demand is rejected, and their suit dismissed, with costs in each of the courts.